# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

MARK STEVEN HEILMAN, *as trustee for the next of kin of Tyler Mark Heilman*,

Plaintiff,

v.

TODD WALDRON, *individually and in his official capacity as an Investigator for the Le Sueur County Sheriff's Department*, and LE SUEUR COUNTY SHERIFF'S DEPARTMENT,

Defendants.

Civil No. 11-1930 (JRT/SER)

**MEMORANDUM OPINION AND ORDER ON MAGISTRATE JUDGE'S MAY 21, 2012 ORDER**

---

Lawrence P. Schaefer, Douglas L. Micko, and Beth A. Erickson, **SCHAEFER LAW FIRM, LLC**, 400 South Fourth Street, Suite 202, Minneapolis, MN 55415, and James R. Behrenbrinker, **BEHRENBRINKER LAW FIRM**, 400 South Fourth Street, Suite 202, Minneapolis, MN 55415, for plaintiff.

Jon K. Iverson, Jason M. Hiveley, and Stephanie A. Angolkar, **IVERSON REUVERS, LLC**, 9321 Ensign Avenue South, Bloomington, MN 55438, for defendants.

Plaintiff Mark Heilman brings this wrongful death action on behalf of the next of kin of Tyler Heilman. Defendant Todd Waldron ("Waldron"), a La Sueur County Sheriff's Department Investigator, shot and killed Tyler Heilman ("Heilman") on July 20, 2009. Plaintiff requested discovery regarding Waldron's medical and mental health treatment. Defendants objected to certain interrogatories and a request for production by Plaintiff on the grounds that they called for irrelevant and privileged information. On

May 21, 2012, United States Magistrate Judge Steven E. Rau issued an order granting Plaintiff's requests for discovery, including responses to Interrogatories 17, 18, 22, and 23, as well as Request for Production 19, all relating to Waldron's medical and mental health communications and records.  Before the Court are Defendants' objections to the May 21, 2012 order.  Because some information about Waldron's medical history related to his physical condition is relevant and there is no federal physician-patient privilege, the Court will partially affirm the order of the Magistrate Judge.  The Court will limit Plaintiff's discovery to medical information relevant to this action, however.  Because there is insufficient evidence currently before this Court to find that Waldron waived his psychotherapist-patient privilege, the Court will sustain Defendants' objection and modify the order of the Magistrate Judge with regard to Waldron's communications with mental health providers.  The Court will, however, review *in camera* certain mental health records to determine if they are privileged.

## BACKGROUND

### I.     JULY 20, 2009 SHOOTING

On July 20, 2009, Waldron shot and killed Heilman.  Heilman's father brings a wrongful death action under Minn. Stat. § 573.02.  There are six counts in this action: a claim of unreasonable use of deadly force against Waldron under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983, a claim for punitive damages under federal law against Waldron, a municipal liability claim against Le Sueur County for inadequately training and supervising officers like Waldron, assault and battery

claims against Waldron, and a vicarious liability claim against Le Sueur County for the assault and battery.

The parties agree on the basic overview of what occurred on the afternoon of July 20. Heilman and Waldron had an altercation in the parking lot outside an apartment complex in Kasota, Minnesota. (*See* Compl. ¶¶ 13, 24-29, July 15, 2011, Docket No. 1; Ans. ¶ 6, Aug. 8, 2011, Docket No. 4.) Following a physical struggle, Waldron fatally shot Heilman approximately four times. (*See* Compl. ¶¶ 27-35; Ans. ¶ 6.)

The parties paint starkly different accounts of who was responsible for the shooting, however. Plaintiff contends that Waldron was angry and unreasonable[1] when he approached Heilman and that Heilman did not know Waldron was a police officer. One witness testified that Waldron was "acting crazy . . . He was like sprinting up to Tyler [Heilman] screaming at him, like it was hard to even understand him. His face was like beet red." (Micko Decl., Ex. 6 at 40.) Witnesses also allege that Waldron did not identify himself as an officer until after Heilman's death. (*See id.*, Ex. 4 at 23, Ex. 5 at 33, Ex. 6 at 37-38, 40-41, Ex. 14 at 36.) At least one eyewitness claims that, after a physical struggle between Heilman and Waldron, Heilman put up his hands, said something to the effect of "I'm done," and began backing away before Waldron needlessly shot him. (*See id.*, Ex. 6 at 42.)

---

[1] *See* Decl. of Douglas L. Micko, Ex. 4 at 28, May 7, 2012, Docket No. 32 (describing Waldron as "angry, he came out of the car angry"); *id.*, Ex. 6 at 41 ("Q: Was he acting like he was very angry?  A: Yes"); *id.*, Ex. 14 at 36 (explaining, "We just thought he was a, like, like an angry, angry person . . .").

Defendants present a very different account.  Defendants allege that Waldron spoke calmly to Heilman at the apartment complex, informing Heilman that he had been driving recklessly and asking to see Heilman's license.  (*See* Ans. ¶ 6; Micko Decl., Ex. 1 at 3, 5.)  Waldron acknowledges that he did not affirmatively state that he was a police officer, but claims the badge on his hip should have indicated to Heilman that he was an officer.  (*See* Micko Decl., Ex. 1 at 5.)  According to Defendants, Heilman was the aggressor and choked Waldron, forcing Waldron to fire his gun in self-defense.  (*See* Ans. ¶ 6.)

## II.    DISCOVERY DISPUTE

### A.    Medical History Regarding Physical Condition

After bringing this action, Plaintiff served discovery requests upon Defendants. One discovery dispute before the Court concerns requests regarding Waldron's medical history and records related to his physical condition.   This dispute surrounds Interrogatories 17 and 18 in Plaintiff's first set of Interrogatories, which read as follows:

> **Interrogatory No. 17.**  Defendant Todd Waldron, identify by name and address all medical doctors, clinics, and/or hospitals where you have received treatment of any kind during the past 5 years and for each such medical provider identified provide a date s) [sic] of service and describe the reason you sought treatment.

> **Interrogatory No. 18.**  Defendant Todd Waldron, state whether during the past 5 years you have been treated by a Doctor of Chiropractic or Osteopathic Physician for any condition and if so, provide the name and address for each such provider along with a description of the treatment and the reasons you required such treatment.

(*See* Micko Decl., Ex. 2 at 9-13.)

Defendants also objected to Interrogatory 23 in Plaintiff's second set of Interrogatories and Request for Production 19, which state:

> **Interrogatory No. 23.**  Defendant Todd Waldron, identify by name and address all medical providers, clinics, psychiatrist [sic], psychologists, counselors, and/or therapists of any kind from whom you have received treatment during the past 10 years and for each such medical provider identified provide the dates of service and describe the reason you sought treatment.

(Aff. of Stephanie A. Angolkar ¶ 6, Ex. 3 at 2-3, May 4, 2012, Docket No. 30.)

> **Request No. 19.**  Signed authorizations to examine Defendant Todd Waldron's medical, psychological, counseling, and therapeutic records, including records pertaining to treatment for substance abuse, for all providers listed in response to Plaintiff's Interrogatories No. 17 and 23. Forms are provided.

(*Id.*, Ex. 4 at 2-3.)


### B.       Mental Health History

In addition to seeking information about Waldron's physical condition, Plaintiff requested information relating to Waldron's mental health.  Plaintiff's first set of Interrogatories to Defendant included a request for information about any counseling in which Waldron may have participated:

> **Interrogatory No. 22.**  Defendant Todd Waldron, state whether you have ever participated in individual, group or marriage/couples counseling during the past 5 years.  If so, identify the name of your counselor or therapist.

(*Id.*, Ex. 1 at 5.)  Also, Interrogatory 23 and Request for Production 19, discussed above, seek information about Waldron's psychiatrists, psychologists, counselors, and/or therapists in addition to other medical providers.  (*See id.*, Ex. 3 at 2-3, Ex. 4 at 2-3.)[2]

## III.  WALDRON'S MEDICAL HISTORY

### A.    Medical History Regarding Physical Condition

Plaintiff points to certain information provided by Waldron to argue that his medical records related to his physical condition are discoverable.  First, Waldron has testified that he sought treatment from a chiropractor for a neck injury sustained during the altercation with Heilman, and Defendants have produced records of that treatment. (*See* Micko Decl. ¶ 4, Ex. 1 at 6-7; Angolkar Aff., Ex. 2.)  However, Defendants have refused to provide records of chiropractic treatment Waldron admittedly received for neck and/or back problems prior to the July 20 incident.  (*See* Micko Decl., Ex. 1 at 7, Ex. 2 at 11.)

Second, there is some information suggesting that Waldron has used "muscle-enhancers," although it is unclear what exact types of enhancers he used.  (*See id.*, Ex. 1 at 7, Ex. 8.)  After the shooting, Special Agent Michael Anderson of the Minnesota Bureau of Criminal Apprehension ("BCA") was called to the scene to investigate the incident.  (*See id.*, Ex. 8 at 7.)  In the course of his investigation, Special Agent Anderson asked both Waldron and Waldron's wife whether Waldron used performance-enhancing drugs, based on "[s]ome information that came up"; Anderson could not remember where

_____

[2] The Court notes that Plaintiff's Interrogatories span a period of time both before and after July 20, 2009.

the information may have come up but it may have been on Facebook.  (*See id.*, Ex. 8 at 9.)  During a deposition, Waldron did not state that he used performance-enhancing drugs but stated that he uses whey protein and has used an over-the-counter "muscle-enhancing" supplement in the past called Creatine.  (*See id.*, Ex. 1 at 7.)

### B.    Mental Health History

Plaintiff also points to certain information provided by Waldron to argue that information about his mental health is discoverable.  First, the records from Waldron's post-shooting chiropractic treatment indicate Waldron was referred for post-shooting counseling and medication.  (*See id.* ¶ 4, Ex. 11.)  Second, an employee of the La Sueur County Sheriff's Department stated in his deposition that he believed that Waldron sought counseling after the shooting, as required by La Sueur County Sheriff's Department policy.  (*See id.*, Ex. 9 at 16).  To date, no records have been produced proving that Waldron in fact received counseling or medication.

### C.    Magistrate Judge's Order

On May 21, 2012, the Magistrate Judge ordered Defendants to provide complete responses to Interrogatories 17, 18, 22, and 23, as well as to Plaintiff's Request for Production 19.  (*See* Mag.'s Order Granting Pl.'s Req. for Disc., May 21, 2012, Docket No. 34.)  The order did not outline the Magistrate Judge's reasons for his decision, and there was no transcript or recording of the telephone conference leading up to this order.

On June 4, 2012, Defendants filed an objection to the Magistrate Judge's order.  (*See* Defs.' Obj. to Mag.'s Order, June 4, 2012, Docket No. 35.)[3]

# ANALYSIS

## I.      STANDARD OF REVIEW

The standard of review for an appeal of a magistrate judge's order on a nondispositive pretrial issue is extremely deferential.  *Reko v. Creative Promotions, Inc.*, 70 F. Supp. 2d 1005, 1007 (D. Minn. 1999).  The district court will reverse the order of a magistrate judge only if the order is clearly erroneous or contrary to law.  28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a).

## II.     MEDICAL INFORMATION RELATED TO WALDRON'S PHYSICAL CONDITION

Defendants first claim that the Magistrate Judge erred because Waldron's medical records and communications are privileged and irrelevant.  The Court must determine, then, whether these communications are privileged and, if they are not privileged, if they are relevant and discoverable.  The Court will address these points in turn.

### A.      Physician-Patient Privilege

Defendants ask this Court to apply Minnesota's physician-patient privilege to protect Waldron's physician-patient communications.  There is no physician-patient

---

[3] Defendant's objections specifically address only Interrogatories 17, 23, and Request for Production 19 while omitting any mention of Interrogatories 18 and 22.  Because of the overlapping issues involving these discovery requests, the Court will address all five requests.

privilege under federal common law,[4] and no federal statutes create such a privilege.[5] Minnesota, in contrast, recognizes a physician-patient privilege.  Minn. Stat. § 595.02, subd. 1(d).  Determining whether to recognize a state privilege in federal question cases, like this one, that involve both federal and state law is a case-sensitive inquiry.[6]  "A strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy."  *United States v. King*, 73 F.R.D. 103, 105 (E.D.N.Y. 1976).  However, where a strong countervailing federal interest exists, courts should not observe a state privilege.  *See id.*

The Court will not recognize the state physician-patient privilege in this case for two reasons.  First, the Eighth Circuit has suggested that federal privilege law applies to federal question cases that include both federal and state claims.  *See Lykken v. Brady*,

---

[4] *See, e.g.*, *Whalen v. Roe*, 429 U.S. 589, 602 n.28 (1977); *United States v. Bercier*, 848 F.2d 917, 920 (8th Cir. 1988); *Morris v. Sequa Corp.*, 275 F.R.D. 562, 567 (N.D. Ala. 2011); *Ulrich v. City of Crosby*, 848 F. Supp. 861, 879 n.24 (D. Minn. 1994).

[5] *See, e.g.*, *United States v. Harper*, 450 F.2d 1032, 1035 (5th Cir. 1971).

[6] *Compare Womack v. Wells Fargo Bank, N.A.*, 275 F.R.D. 571, 573 (D. Minn. 2011) (finding that Minnesota's physician-patient privilege protected all undisclosed medical records of a plaintiff who brought an action under both Title VII of the Civil Rights Act of 1964 and the Minnesota Human Rights Act); *Ulrich v. City of Crosby*, 848 F. Supp. 861, 879 n.24 (D. Minn. 1994) (applying Minnesota's physician-patient privilege in a case involving alleged violations of state and federal law); *Gobuty v. Kavanagh*, 795 F. Supp. 281, 288-89 (D. Minn. 1992) ("there is no reason to afford the physician-patient relationship less protection in federal proceedings than in state proceedings.") *with Vann v. Lone Star Steakhouse & Saloon of Springfield, Inc.*, 967 F. Supp. 346, 349 (C.D. Ill. 1997) ("Because the instant case is a federal question case, and not one of diversity, the federal common law of privileges applies."); *Gallardo v. Bd. of Cnty. Comm'rs*, 881 F. Supp. 525, 529 (D. Kan. 1995) ("[I]n a federal question case the court must apply federal common law, rather than state law, regarding evidentiary privileges."); *In re Grand Jury Subpoena*, 460 F. Supp. 150, 151 (D. Mo. 1978) ("[I]t is clear that in a non-diversity jurisdiction case, the question of privilege is governed by federal common law.").

No. Civ. 07-4020-KES, 2008 WL 2077937, at *4 n.3 (D.S.D. 2008) (discussing *In re Bieter*, 16 F.3d 929, 935 (8th Cir. 1994)).[7]   There is an especially strong interest in applying federal rules to actions with alleged § 1983 violations because of the significant federal interest in such cases.[8]  Second, there is a federal interest in refusing to apply the physician-patient privilege, in particular, in federal question cases.[9]  Federal courts have consistently refused to recognize a federal physician-patient privilege, and the Advisory Committee Notes to the Federal Rules of Evidence concluded that there is "little if any basis" for such a privilege.  *See* Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 514App.01 (Joseph M. McLaughlin ed., 2d ed. 2012).  For these reasons, the Court finds that the Magistrate Judge did not err in refusing to apply a physician-patient privilege in this case.

## B.     Relevancy

Because Waldron cannot claim a privilege with respect to physician-patient communications related to his physical condition, the Court must determine if the

---

[7] *See also United States v. Yielding*, 657 F.3d 688, 706-07 (8th Cir. 2011) (noting that "[i]n the absence of a relevant federal rule, statute, or constitutional provision, federal common law governs questions of privilege" in at least some federal question proceedings).

[8] *See, e.g., Bryant v. Armstrong*, Civ. No. 08-2318, 2012 WL 2190774, at *6 (S.D. Cal. 2012) ("State privilege law does not govern discovery issues in federal § 1983 cases."); *Green v. Fulton*, 157 F.R.D. 136, 139 (D. Me. 1994) (finding that, because the "gravamen of the plaintiff's complaint concerns a violation of his federal constitutional right to be free from the use of excessive force[,]" the case involves primarily a federal civil rights question and thus federal common law privileges should apply); *Miller v. Pancucci*, 141 F.R.D. 292, 297-99 (C.D. Cal. 1992).

[9] In contrast, "[i]n **diversity** actions, state law determines the existence and scope of . . . privilege." *Gray v. Bicknell*, 86 F.3d 1472, 1482 (8th Cir. 1996) (emphasis added).

- 10 -

communications are relevant and discoverable.   Relevance is construed broadly at the discovery stage.   The wide scope of discovery under Federal Rules of Civil Procedure 26 allows parties to obtain "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ."   Fed. R. Civ. P. 26(b)(1).   Information sought in discovery need not be admissible at trial, so long as it appears reasonably calculated to lead to the discovery of admissible evidence.   *Id.*

Plaintiff argues that he is entitled to broad information about Waldron's medical history because there is no privilege.   Plaintiff specifically points to information about Waldron's neck and back and his use of performance-enhancing drugs or supplements as relevant to this action.

The Court finds that physician-patient communications regarding Waldron's neck and back are relevant.   Defendants contend that Waldron's use of force was necessary to overcome Heilman's chokehold.   (*See* Ans. ¶ 6.)   Defendants have also pointed to Waldron's neck injuries, which Heilman allegedly caused.   It is thus important for Plaintiff to determine to what extent Waldron's neck injuries preexisted his altercation with Heilman.   Furthermore, it is possible that Heilman's neck or back injuries may have caused him to react more extremely to a physical altercation with Waldron, making records documenting these injuries prior to July 20 relevant.   *See Hutton v. City of Martinez*, 219 F.R.D. 164, 166-168 (N.D. Cal. 2003) (finding an officer's medical records relevant to the officer's physical capabilities on the day of the shooting and also to any motive the officer may have had for shooting the victim rather than pursuing an alternative course of action).   Because Plaintiff's request for discovery of Waldron's

physician-patient communications is reasonably calculated to lead to information about whether Waldron's neck injuries preexisted the July 20 incident, it was not clear error for the Magistrate Judge to allow discovery of Waldron's medical history and records that they relate to his neck or back injuries.

In addition, the Court finds that Plaintiff is entitled to obtain medical records that mention any use by Waldron of performance-enhancing drugs or supplements.[10]   The Court notes that it is unclear whether Waldron has ever used performance-enhancing drugs and when Waldron stopped using performance-enhancing supplements. Nonetheless, Plaintiff is entitled to obtain information about Waldron's use of such drugs or supplements because this information could be relevant to determining Waldron's physical strength on July 20 and the objective reasonableness of his actions.  *See, e.g.*, *Mayard v. Siegfried*, Civ. No. 08-5853, 2011 WL 579334, at *3 (D. Minn. Feb. 8, 2011) (finding relative size of officer relevant to excessive force claim).

Plaintiff has not explained, however, how Waldron's other physician-patient communications are even potentially relevant to this case.  Therefore, at this stage, the Court finds that the Magistrate Judge's order is overbroad in demanding the disclosure of other medical information.  *See, e.g.*, *E.E.O.C. v. Woodmen of World Life Ins. Soc.*, No. 8:03-165, 2007 WL 649298, at *3 (D. Neb. 2007) (holding that defendant was entitled to information about an alleged victim's mental health, but was not entitled to the patient's gynecological history due to a lack of relevance).  The Court will only allow

---

[10]  By "performance-enhancing drugs or supplements," the Court means any drugs or supplements that were intended to or did improve Waldron's strength or athletic ability.

discovery of matters related to Waldron's neck or back injuries and Waldron's use, if any, of performance-enhancing drugs or supplements.[11]   The Court will also restrict discovery to the last five years because Plaintiff has not demonstrated that physician-patient communications prior to that time are relevant.  *See, e.g.*, *Clark v. Baka*, No. 4:07-CV-00477, 2008 WL 4531708, at *4 (E.D. Ark. Oct. 9, 2008) (restricting time frame of appropriate discovery).

## III.   MEDICAL INFORMATION RELATED TO WALDRON'S PSYCHOLOGICAL CONDITION

Defendants next claim that the Magistrate Judge erred in ruling that Waldron is obligated to disclose his mental health history and records.  Unlike the physician-patient privilege, the federal common law recognizes a psychotherapist-patient privilege that protects confidential communications between psychotherapists and patients, as well as records from psychotherapist sessions.  *See Jaffee v. Redmond*, 518 U.S. 1, 4, 9-10, 15 (1996).  This privilege extends to psychiatrists, psychologists, clinical social workers, and others engaged in mental health treatment.  *See id.* at 15-16.  To determine if the privilege applies in this case, the Court will first outline the standard for determining when a party must disclose psychotherapist-patient communications and then discuss if Waldron's communications are discoverable.

---

[11] With respect to Request for Production No. 19, this Court will not order Defendants to provide signed authorizations allowing Plaintiff to examine Waldron's medical records because of the possibility that records may be disclosed beyond those deemed discoverable.  Instead, the Court will order Defendants to produce information to Plaintiff.  In addition, the Court notes that it would entertain a motion by Defendants to seal these medical records if they include sensitive information.

A.      **Applicable Standard**

There is a split among courts regarding when a party must disclose psychotherapist-patient communications.  In *Jaffee*, the Supreme Court found that a psychotherapist-patient privilege exists in federal common law because of the "imperative need for confidence and trust" in the psychotherapist-patient relationship.  *Id.* at 10.  However, *Jaffee* did not outline when a party could overcome the privilege; rather it stated only "we do not doubt that there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist."  *Id.* at 18 n.19.  Accordingly, the limits of the psychotherapist-patient privilege are unclear.

There is a split among courts in this district regarding whether, when a party seeks the disclosure of psychotherapist-patient communications through discovery, the relevance standard of Federal Rule of Civil Procedure 26 or the heightened standard in Federal Rule of Civil Procedure 35 applies.  Rule 26 permits discovery that is "broad in scope[,]" requiring that "the information sought is relevant to the subject matter involved in the pending action."  *Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minn.*, 187 F.R.D. 578, 589 (D. Minn. 1999) (internal quotation marks and citation omitted).  "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).  The discovery allowed under Rule 35, which addresses when a court may order a party to undergo an independent physical or mental examination, is more limited in

scope.   Rule 35 allows a court to order an independent examination when a party's mental or physical condition is "in controversy" and if there is "good cause" to do so. *Schlagenhauf v. Holder*, 379 U.S. 104, 118-19 (1964).   Some courts have held that psychotherapist-patient communications are discoverable if they are "relevant" under Rule 26, while others have held that the communications are not discoverable if they are "in controversy" under Rule 35.   *See, e.g.*, *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 267 F.R.D. 257, 268-69 (D. Minn. 2007) (outlining cases).[12]

This Court declines to follow either line of reasoning.   Because psychotherapist-patient communications are privileged, the Court may not order these communications produced merely because they are relevant under Rule 26.[13]   In fact, Rule 26 itself has an important caveat, allowing the discovery of relevant information only if it is **nonprivileged**.   Fed. R. Civ. P. 26(b).   Furthermore, although Rule 35 has similarities to

---

[12] For further detail about this split, see, e.g., *Heilman v. Waldron*, Magistrate J. Order at 5 n.2, Apr. 26, 2012 (Docket No. 27); *John Doe I v. Mulcahy, Inc.*, Civ. No. 08-306, 2008 WL 4572515, at *4 (D. Minn. Oct. 14, 2008) (noting that "some of these cases conflate privilege/waiver with relevancy, medical records with medical examinations, and generic medical records with mental-health-related medical records").

[13] A court may not order privileged information disclosed simply because it meets the lenient Rule 26 relevance standard, *see Jaffee*, 518 U.S. at 17-18 ("Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the [psychotherapist-patient] privilege."); *Johnson v. Norris*, 537 F.3d 840, 846 (8th Cir. 2008) ("[W]e specifically rejected an argument in the context of a discovery dispute that *Jaffee* allows for a 'balancing' approach to the psychotherapist-patient privilege.").   *But see*, *Holter v. Wells Fargo and Co.*, 281 F.R.D. 340, 342 (D. Minn. 2011),

federal common law standards of privilege, it is not directly on point because it addresses only when a court may order independent medical evaluations.[14]

Instead, because the Federal Rules of Civil Procedure do not delineate the contours of the psychotherapist-patient privilege, the Court finds that the applicable standard should be drawn from federal common law discussing other types of privilege. *See Schoffstall v. Henderson*, 223 F.3d 818, 823 (8th Cir. 2000) (looking to the federal common law of attorney-client privilege to determine if a plaintiff waived the psychotherapist-patient privilege). Under the federal common law, a party can waive a privilege by, among other reasons not applicable here, (1) putting otherwise privileged communications "at issue" in the litigation or (2) disclosing those communications. *See, e.g., id.; United States v. Davis*, 583 F.3d 1081, 1090 (8th Cir. 2009). Accordingly, the Court now turns to the question of whether Waldron has waived the privilege by putting his psychotherapist-patient communications "at issue" or by disclosing those communications.

### B.    Application of Standard to Waldron

Regarding the first type of waiver, putting communications "at issue," the Court finds no evidence that Defendants have put Waldron's mental state at issue. Although Defendants have disclosed that Waldron may have sought counseling after the shooting,

---

[14] This Court has previously found Rule 35 useful in analyzing the psychotherapist-patient privilege because of its similarities to the federal common law of privilege on the issue of waiver. *See Dochniak v. Dominium Mgmt. Servs., Inc.*, 240 F.R.D. 451, 452 (D. Minn. 2006). However, the Court finds it more instructive to look directly to the federal common law of privilege.

there is no indication that Defendants intend to discuss Waldron's psychological treatment or condition at trial.  *See Vanderbilt v. Town of Chilmark*, 174 F.R.D. 225, 229 (D. Mass. 1997) ("[T]he fact that a communication has taken place does not necessarily put [its] content at issue."); *cf. Batiste-Davis v. Lincare, Inc.*, 526 F.3d 377, 381 (8th Cir. 2008) (finding the plaintiff's mental condition at issue in a wrongful termination action when the plaintiff called her treating social worker to testify about the psychological impact of her termination).  Indeed, it is unclear if Waldron sought counseling after the shooting at all.  Thus, it does not appear that Defendants plan to put Waldron's psychological condition at issue.[15]

Plaintiff also argues that Waldron put his mental condition at issue because Defendants assert in their answer that Heilman's actions caused Waldron to reasonably fear for his life.  Plaintiff fails to explain, however, how that assertion puts Waldron's mental condition at issue.  "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them . . . ."  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  Plaintiff has not articulated why Waldron's mental condition would be at issue given this objective standard for reasonableness.  Also, it is too broad to say that, whenever a party states that he or she experienced a short-term emotion such as fear, this claim puts his or her long-term mental condition at issue.  *See, e.g., Womack v.*

---

[15] Furthermore, even if Defendants plan to make Waldron's psychological condition an issue at trial without prior disclosure, the Court would likely not allow them to do so.  *See Haviland v. Catholic Health Initiatives-Iowa, Corp.*, 692 F. Supp. 2d 1040, 1046 (S.D. Ia. 2010) ("The Court notes that if Defendant does attempt to submit at trial a defense based on improperly withheld discoverable material, Plaintiffs are not without recourse, as Plaintiffs can always move to estop introduction of such evidence at trial.").

*Wells Fargo Bank, N.A.*, Civ. No. 09-3582, 275 F.R.D. 571, 572 (D. Minn. Apr. 26, 2011) (holding that even claims of "garden variety" emotional distress damages do not place a medical condition into controversy).  Because Waldron has not yet expressed an intention to put his mental state "at issue," he has not waived his psychotherapist-patient privilege.  Furthermore, even assuming that a plaintiff could place a defendant's psychological history at issue, Heilman has articulated no basis at this stage for finding that he has done so.  As stated above, the mere fact that this information could potentially be relevant is insufficient.

Regarding the second type of waiver, waiver by disclosing communications, the Court finds that Defendants have not disclosed information that waives Waldron's privilege.  Defendants' mere suggestions in discovery that Waldron may have sought counseling after the shooting do not waive Waldron's privilege.[16]  Defendants have not revealed the content of any psychotherapist-patient communications and have not even established that such communications took place.  Therefore, Defendants have not, through disclosures to Heilman, waived the psychotherapist-patient privilege.  *See Kirschner v. Klemons*, No. 99-4828, 2001 WL 1346008, at *3 n.1 (S.D.N.Y. 2001) (holding that a defendant's "vague references to [privileged] discussions . . . do not sufficiently reveal the substance of his communications . . . so as to effectuate a waiver

---

[16] Plaintiff has cited no cases showing that the mere mention that Waldron might have undergone counseling waives the privilege.  In other contexts, the mention that a privileged communication occurred does not waive a privilege.  *See, e.g.*, *PaineWebber Group, Inc. v. Zinsmeyer Trusts P'ship*, 187 F.3d 988, 992 (8th Cir. 1999) (noting that disclosing the existence of privileged documents without disclosing the underlying communications does not waive the attorney-client privilege).

on that ground"), *superseded on other grounds by Kirschner v. Klemons*, No. 99-4828, 2001 WL 36140906 (S.D.N.Y. 2001) (citation omitted).

Plaintiff also states that the psychotherapist-patient privilege may not apply to Waldron's mental health records, because, Plaintiff alleges, any counseling sessions "were likely a result of Le Sueur County's policy" and therefore not understood by Waldron to be private sessions.  (Pl.'s Memo in Supp. of Req. for Access to Waldron's Records at 17, May 7, 2012, Docket No. 31.)  A police officer's mental health records are not privileged when the officer attends a required post-shooting counseling session with the knowledge that records of the session will be sent to the police department.  *See Kamper v. Gray*, 182 F.R.D. 597, 599 (E.D. Mo. 1998).  Defendants have not denied that Waldron underwent counseling sessions ordered by the Le Sueur County Sheriff's Department nor that the Department has access to the records of such sessions. Furthermore, it appears that Waldron very likely underwent counseling due to a requirement of the Le Sueur County Sheriff's Department.  Accordingly, the Court will order that Defendants submit to the Court for *in camera* review any mental health records[17] (1) from mental health treatment that Heilman received pursuant to Le Sueur County Sheriff's Department policy or directives, or (2) that were received by or are otherwise accessible to the Le Sueur County Sheriff's Department.[18]

---

[17] By "mental health records," the Court means the records of a psychiatrist, psychologist, counselor, social worker, or other mental health professional who treated Heilman.

[18] By "accessible to the Le Sueur County Sheriff's Department," the Court means records to which the Le Sueur County Sheriff's Department currently has access or has had access to in the past through, for example, a medical release executed by Waldron.

Although Waldron's psychotherapist-patient privilege may ultimately be waived by Defendants putting Waldron's mental condition at issue or disclosing otherwise privileged communications, the Court finds at this time that Waldron has not waived his privilege.  As a result, the Magistrate Judge erred in granting Plaintiff's requests for Waldron's mental health history and records.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, the Court **SUSTAINS in part** and **OVERRULES in part** Defendants' objections [Docket No. 35]. The May 21, 2012 Order of the Magistrate Judge  [Docket No. 34]  is **AFFIRMED in part, MODIFIED in part**, and **REVERSED in part** [Docket No. 34].   Accordingly, **IT IS HEREBY ORDERED** that:

1.     As to Plaintiffs' request seeking an order compelling responses to Plaintiffs' Interrogatories Nos. 17 and 18, the request is **GRANTED** as follows:

   a.     Defendant Todd Waldron is ordered to provide a complete response to Interrogatories Nos. 17 and 18 with respect to medical treatment that relates to (1) Waldron's neck or back injuries or (2) Waldron's use, if any, of performance-enhancing drugs or supplements.

   b.     The request is **DENIED** in all other respects.

2.     As to Plaintiffs' request seeking an order compelling responses to Plaintiffs' Interrogatory No. 22, the Magistrate Judge's Order is **REVERSED**.  Plaintiffs' request is **DENIED**.

3.     As to Plaintiffs' request seeking an order compelling responses to Plaintiffs' Interrogatory No. 23, the request is **GRANTED** as follows:

a.     Defendant Todd Waldron is ordered to provide a response to Interrogatory No. 23 with respect to "medical providers" and "clinics" that Waldron has seen during last five (5) years and with whom Waldron has discussed (1) his neck or back injuries or (2) his use of performance-enhancing drugs or supplements;

b.     The request is **DENIED** in all other respects.

4.     As to Plaintiffs' request seeking an order compelling responses to Plaintiffs' Request for Production of Documents No. 19, the request is **GRANTED** as follows:

a.     Defendant Todd Waldron is ordered to provide a copy for Plaintiff of any medical records from the past five (5) years relating to Waldron's (1) neck or back injuries or (2) Waldron's use, if any, of performance-enhancing drugs or supplements;

5.     Defendants shall provide all responses and documents consistent with the above within twenty-one (21) days of this Order; and

6.     Nothing in this Order shall be construed to require the production of information regarding mental health treatment received by Heilman, except that:

a.      Defendants are ordered to submit to the Court for *in camera* review within twenty-one days (21) of this order any mental health records (1) related to mental health treatment that Heilman received pursuant to Le Sueur County Sheriff's Department policy or directives, or (2) that were received by or are otherwise accessible to the Le Sueur County Sheriff's Department.


DATED:   October 9, 2012                   _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                        JOHN R. TUNHEIM
                                             United States District Judge